RUSSELL, RESPONDENT, *v.* CHICAGO, BURLINGTON & QUINCY RY. CO., APPELLANT.

(No. 2,511.)

(Submitted March 3, 1908. Decided March 5, 1908.)

[94 Pac. 488.]

*Common Carriers—Live Stock—Transportation—Negligent De-*
*lay—Liability of Carrier—Complaint—Sufficiency—Evidence*
*—Admissibility—Nonsuit—Consideration.*

Common Carriers—Transportation of Live Stock—Negligent Delay—Com-
plaint—Sufficiency.
1. A complaint in an action against a carrier for damages on account
of delay in transporting cattle, which alleged that defendant company
accepted the cattle for transportation and agreed to transport the
same to the point of destination; that, by reason of its negligence in
not furnishing sufficient motive power and cars and in not properly
managing the running of its trains, the train carrying the cattle was
delayed, whereby the cattle shrank in weight and depreciated in price,

stated a cause of action *ex delicto,* based on a violation of defendant's duty as carrier.

Same—Liability of Carrier—Limitation.

2.    A carrier, in accepting shipments, accepts them subject to the liabilities imposed by law, and the only way in which such liabilities may be varied or limited is by special contract.

Same—Live Stock—Shrinkage in Weight—Negligent Delay—Question for Jury.

3.    Evidence examined, in the action mentioned in paragraph 1 above, and *held,* that the question whether plaintiff's cattle shrank in weight and depreciated in value as a result of negligent delay, or other want of ordinary care, on the part of defendant railway company, was properly submitted to the jury.

Same—Pleading and Proof.

4.    The allegations of the complaint in the cause referred to above, that, on account of defendant's negligent delay in transportation the cattle shrank greatly in weight and depreciated in price by reason thereof, and that plaintiff was informed and believed that during such delay in transportation the market price of cattle declined in the price per hundredweight, were sufficient to warrant the admission of testimony relative to depreciation in the market price of cattle, especially where defendant had made no effort to have the complaint made more definite and certain by demurrer or otherwise.

Same—Evidence—Admissibility.

5.    Plaintiff in the above action having testified that his cattle were of uniform breeding and that those injured during transportation were better than those shipped by him theretofore, his testimony with reference to the average weights of his cattle in previous years was competent.

Same—Contract of Transportation—Consideration—Nonsuit.

6.    Where, in an action against a carrier for delay in transporting cattle, the answer admitted that the defendant railway company accepted the shipment for transportation and agreed to transport the cattle to a designated point, a motion for nonsuit on the ground that the complaint did not allege that there was any consideration for the contract of transportation was properly denied.

*Appeal from District Court, Lewis and Clark County; Thos. C. Bach, Judge.*

ACTION by Edward C. Russell against the Chicago, Burlington & Quincy Railway Company. From a judgment for plaintiff, and from an order denying a new trial, defendant appeals. Affirmed.

*Messrs. Lamb & Walker,* for Appellant.

*Mr. Wm. T. Pigott,* for Respondent.

MR. JUSTICE SMITH delivered the opinion of the court.

The complaint in this action reads as follows: "Plaintiff complains of the defendant, and alleges:

"(1) That the defendant is a corporation organized and doing business under the laws of the state of Illinois, and doing business in the states of Montana, Wyoming, South Dakota and Nebraska.

"(2) That the said defendant corporation is the owner of and maintains and operates a railroad, as a common carrier, from the city of Billings, in the state of Montana, to the city of Omaha, in the state of Nebraska.

"(3) That on the twenty-fifth day of October, 1905, and until the third or fourth day of November, 1905, the plaintiff was the owner of certain cattle, to-wit, ninety (90) head of cattle, consisting of thirty-three (33) steers, forty (40) cows, and seventeen (17) yearling heifers, all in good order and condition, and suitable for the market as beef cattle.

"(4) That on the twenty-sixth day of October, 1905, plaintiff delivered, at the city of Billings, state of Montana, to the defendant corporation, as a railroad company, the said cattle in good order and condition for transportation by said defendant to the city of Omaha, in said state of Nebraska.

. "(5) That said defendant accepted said cattle from the plaintiff for such transportation, and undertook and agreed to transport said cattle upon its line of railroad from said city of Billings to said city of Omaha, and to deliver the said cattle at said city of Omaha in good order within a reasonable time.

"(6) That, by the use of proper means of transportation and proper management of its trains and railroad, the said defendant should have delivered said cattle at said city of Omaha upon the twenty-ninth day of October, 1905, so that said cattle should have been placed upon the cattle market in said city of Omaha on Monday, the thirtieth day of October, 1905.

"(7) That by reason of the negligence of the defendant in not furnishing good and sufficient motive power and cars, and

in not properly managing the running of its trains, whereby the train carrying said cattle was constantly delayed, said cattle being upon the cars without being unloaded and without food and water for more than sixty hours between the city of Billings, in the state of Montana, and the town of Alliance, state of Nebraska, and was otherwise delayed, said cattle were not delivered by defendant at said city of Omaha until the afternoon of Wednesday, the first day of November, 1905, too late to be placed upon the cattle market of said city of Omaha upon that day. That plaintiff is informed and believes that during said negligent delay in transportation, from October 30, 1905, to November 2, 1905, that the market price for said cattle declined in the price per hundredweight; that on account of said negligent delay in transportation said cattle shrank greatly in weight and depreciated greatly in price on account thereof.

"(8) That, by reason of the said negligence of the defendant, plaintiff was damaged in the sum of four hundred and eighty ($480) dollars.

"Wherefore plaintiff prays judgment against the defendant for the sum of four hundred and eighty ($480) dollars and interest thereon at the rate of eight (8) per cent per annum, from the fourth day of November, 1905, and for his costs herein."

The following is the defendant's answer: "Comes now the defendant, and for its answer to complaint of plaintiff in the above-entitled action admits, denies, and alleges:

"(1) Admits the defendant is a corporation doing business in the states of Montana, Wyoming, South Dakota, and Nebraska.

"(2) Admits the allegations contained in paragraphs 2, 3, and 4 of plaintiff's complaint.

"(3) Admits that this defendant accepted said cattle mentioned in plaintiff's complaint for transportation, and undertook and agreed to transport said cattle upon its line of railroad from the city of Billings to the city of Omaha, and to deliver the cattle at the city of Omaha.

" " (4) Denies each and every allegation contained in paragraphs 6, 7, and 8 of plaintiff's complaint. Denies each and every allegation contained in plaintiff's complaint not herein specifically admitted or denied.

"Wherefore defendant prays judgment that the plaintiff take nothing by his complaint; that defendant be dismissed without pay and recover its cost herein."

Plaintiff had a verdict for the sum of $541; and from a judgment entered thereon and an order denying a new trial, defendant appeals.

It is contended that the evidence is insufficient to support the judgment, for the following reasons: "There is a total absence of any evidence showing any negligence upon the part of the defendant, and the only evidence in the record showing any occasion for delay is to the effect that the train was 'delayed by two wrecks of other trains obstructing the road, and by the derailing of the trucks of the tender of one engine of our train' (meaning the train upon which the cattle were shipped), and from this evidence it could not be said that the defendant was guilty of negligence, for the negligence might have been occasioned by some other person or some other railway company causing the delay, and the derailing of the trucks of the tender of one of the engines of the train upon which plaintiff's cattle were shipped might have been occasioned by some reason other than the negligence of the defendant. The complaint alleges that the negligence consisted of 'not furnishing good and sufficient motive power and cars, and in not properly managing the running of its trains,' but there is a total absence of any evidence tending in any wise to support this allegation. There is also a total want of any competent evidence showing that there was any shrinkage of certain of the cattle in question by reason of any alleged delay, for the reason that there is no competent testimony showing any shrinkage, for the reason that the only testimony in this record is the mere estimate of certain witnesses, in substance as follows (speaking of the shrinkage) : 'I would judge that it was from 75 to 80 pounds

per head as an average.' The evidence as to the depreciation of the market is more indefinite and uncertain than the testimony with reference to the shrinkage, which is in substance as follows: 'They were about 15 cents or 20 cents per 100 better on Monday and Tuesday.' "

The following, taken from respondent's brief, seems to be a fair statement of what the evidence tended to show: "By defendant's road the distance between Billings and Alliance is 476 miles, and between Alliance and Omaha 430 miles. The usual running time between Billings and Alliance was 24 to 26 hours; but more than 60 hours were consumed in the present instance. The causes of the delay were wrecks of other trains obstructing the track, derailment of engine, side tracking for other trains, and waiting for the engine to take water. Defendant refused opportunity to water and feed between Billings and Alliance, as it had no place where stock could be handled. At Alliance there were not enough of defendant's men to feed the cattle, and hay was scarce, and some of the cattle went more than 66 hours without being fed. When unloaded at Alliance, the cattle showed the effect of being 60 hours on their feet without food or water, being greatly shrunken and exhausted, and it was only by great effort that they were kept on their feet. The custom was to feed at Alliance, then feed and rest at Lincoln, and on the next morning run the 54 miles into Omaha with the cattle in good shape; and such was the understanding when the cattle were shipped, and would have been carried out if the defendant had made reasonable time. The cattle reached Omaha, November 1st, whereas they should have reached there early on Monday morning, October 30th. When the cattle reached Omaha, they were in very bad condition, and were shrunken considerably more on account of the hardships of the trip than cattle usually do in making that trip, and they lost in the opinion of expert witnesses by extra shrinkage from 50 to 100 pounds per head as an average. Their shrunken, bad and stale appearance of itself alone made a difference in the selling price of from 15 to 25 cents per hundredweight. Part

of the cattle were sold on November 1st, and part on November 2d, and the remainder on the 3d, and the market price for that class of cattle was from 10 to 15 cents lower per hundredweight than it was on October 30 and 31.''

The complaint states a cause of action *ex delicto.* It is based upon a violation of the defendant's duties as a common carrier. A carrier in accepting shipments always accepts them subject to the liabilities imposed by law. The only way in which it can at all vary or limit this liability is by special contract. (*Nelson* v. *Great Northern Ry. Co.,* 28 Mont. 297, 72 Pac. 642.) In the *Nelson Case* this court said: ''Section 2912 of the Civil Code provides: 'A common carrier is liable for delay only when it is caused by his want of ordinary care and diligence.' This is equivalent to saying that a common carrier shall be liable for damages resulting from delays caused by its want of ordinary care and diligence; that is, for ordinary negligence. * * * The handling of the defendant's trains was a matter peculiarly within the power of the defendant. The shipper could exercise no control. He was bound to await the will and action of the carrier; and, if his stock was injured as a result of negligent delay on the part of the carrier, he is, in the absence of negligence or fault on his part, entitled to reasonable compensation for such damages as he may have suffered by reason of loss or injury to his stock. * * * It was the duty of the defendant to afford to the shipper proper facilities for watering, feeding, tending and caring for the stock, and to transport the stock with reasonable diligence, and with as little delay as practicable.''

In the light of the testimony heretofore summarized, we are of opinion that the question whether the plaintiff's stock was injured as a result of negligent delay, or other want of ordinary care, on the part of the defendant, was properly submitted to the jury by the trial court.

The second proposition set forth by the appellant, as to a lack of competent evidence of any shrinkage of the cattle, is not argued in the brief; but we have examined the testimony com-

plained of, and are of opinion that it was competent and sufficiently definite and certain to warrant the jury in acting upon it.

Again, it is said by counsel for the appellant: "The evidence with reference to depreciation in price is certainly inadmissible under the complaint, for the reason that the plaintiff does not allege what the market price was on the dates when he anticipated delivery and sale at South Omaha, and what he was compelled to sell them for; nor is there any allegation that he was compelled to, or did, sell these cattle for a less price than that which could have been obtained if the cattle had been delivered on the date he anticipated. Certainly the testimony of the plaintiff with reference to the weights of his cattle in previous years was incompetent for the purpose of establishing the weight of his cattle in the year 1905." It will be observed that the allegation of the complaint is "that, on account of said negligent delay in transportation, said cattle shrank greatly in weight and depreciated greatly in price on account thereof," and "that plaintiff is informed and believes that during said negligent delay in transportation, from October 30, 1905, to November 2, 1905, that the market price for said cattle declined in the price per hundredweight." This allegation is sufficient to warrant the admission of the testimony complained of. No effort to make the complaint more definite and certain, by demurrer or otherwise, is disclosed by the record.

Plaintiff testified that his cattle were "exceptionally uniform" on account of the method of breeding carried on for many years. He also said: "I have kept the weights for the past 12 years of all my shipments of cattle, and the steers have averaged during that time, eight of those years at Chicago and four of those years at Omaha, 1,143 pounds. The cows have averaged 1,105 pounds. I never have shipped heifers until 1905, and therefore I haven't the average weight of them. I have reference to the weights at the other end. Chicago is nearly 1,000 miles beyond Omaha. The account of the sales show that the average weight of the steers in these shipments were 1,066 pounds, 70-odd

pounds less than the average; that the weight of the cows in this shipment was 1,005, 100 pounds less than the average. There is no comparison on the heifers. This was my first shipment of heifers. These figures apply to the shipment of cattle in question here.  *  *  *  My steers have averaged in the eastern market for 10 years 1,143 pounds, and these shipments averaged only 1,066 pounds. These cattle were better. This was the best bunch of cattle I had shipped for years. . I had hired a couple of sections and had them in good pasture all summer; whereas, in former years they had run on the range. I considered them the best bunch of cattle I had shipped in years, especially the cows. They were a beautiful, clean, smooth bunch of cows." In view of his statement that his cattle were of uniform breeding, and that the animals injured were better than the shipments previously made, we are of opinion that plaintiff's testimony as to the average weights was competent.

At the close of plaintiff's case the defendant interposed a motion for a nonsuit. In their brief counsel urge that the motion should have been granted, because there is no allegation in the complaint "that there was any consideration passed from the plaintiff to the defendant for the transportation of the cattle therein mentioned." It is, perhaps, only necessary to say in relation to this point that the answer admits that "the defendant accepted said cattle  *  *  *  for transportation, and undertook and agreed to transport said cattle upon its line of railroad from the city of Billings to the city of Omaha, and to deliver the cattle at the city of Omaha."

It is further contended, in the brief, that the motion for a nonsuit should have been granted, for the reason "that there is no allegation in the said complaint alleging that the plaintiff was compelled to, or did, sell his cattle for a price less than that which he would have received had there been no unreasonable delay in their transportation; that there is no allegation in said complaint as to any definite loss in weight by reason of any delay in transportation; nor is there any allegation in said complaint that the defendant is indebted to the plaintiff in any sum

whatever." As counsel have contented themselves with the bare statement just quoted, we think we may, without discourtesy, simply state that we do not agree with them.

The judgment and order appealed from are affirmed.

*Affirmed.*

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE HOLLOWAY concur.

ON MOTION TO DISMISS APPEALS.

(Decided March 16, 1908.)

[94 Pac. 501.]

*Appeal—Undertakings—Sufficiency — Statutes — Constitutional Law.*

Bonds and Undertakings—Distinction.

1. The chief distinction between a statutory bond and a statutory undertaking is, that to the former the principal must be a party, while to the latter the person on whose behalf it is executed need not be a party.

Undertaking on Appeal—Signature of Principal.

2. An undertaking on appeal filed in conformity with sections 1724 and 1725 of the Code of Civil Procedure need not be signed by the party in whose behalf it is given.

Same—Statutes—Title—Constitution.

3. *Held,* that the Act of March 7, 1899 (Laws 1899, p. 79), "relating to bonds of officers and other bonds," in so far as it applies to undertakings on appeal, runs counter to the provisions of section 23, Article V of the Constitution, declaring that no bill shall be passed containing more than one subject, which shall be clearly expressed in its title, and is, to that extent, invalid.

MR. CHIEF JUSTICE BRANTLY delivered the opinion of the court.

Soon after the record in this cause was filed in this court the respondent submitted a motion to dismiss the appeals on the ground that the bond or undertaking on appeal was not signed nor executed by the appellant. The original undertaking was filed under section 1724 of the Code of Civil Procedure, declaring that "the appeal is ineffectual for any purpose unless

within five days after service of the notice of appeal, an un-dertaking be filed  *  *  *  with the clerk as hereinafter pro-vided.  *  *  *'' The following section (1725) provides: ''The undertaking on appeal must be in writing, and must be ex-ecuted on the part of the appellant by at least two sureties, to the effect that the appellant will pay all damages and costs which may be awarded against him on the appeal,'' etc.

The chief distinction between a statutory bond and a statutory undertaking is, as pointed out in *King* v. *Pony Gold Mining Co.,* 24 Mont. 470, 62 Pac. 783, that to the former the principal must be a party, while to the latter the person on whose be-half it is executed need not be a party. A discussion of this or any other distinction is not pertinent here, further than to remark that upon this technical distinction, which is one of form rather than substance, the merit of the motion to dismiss the appeal rested. In other respects the terms ''bond'' and ''un-dertaking'' may for present purposes be regarded as having the same meaning, and may be used interchangeably as con-vertible terms.

While under the foregoing provisions it is indispensable to an appeal that an undertaking be given upon the part of the appellant by two sureties, neither one of them requires it to bear the signature of the principal. And so the law has been in this jurisdiction since the organization of the territorial govern-ment. (Bannack St. Civ. Pr. Act, 263; Laws Mont., 1871-72, p. 110, sec. 381; Rev. Stats. 1879, Div. 1, sec. 410; Comp. Stats. 1887, First Div., sec. 423; Code Civ. Proc., secs. 1724, 1725, *supra.*) This court has uniformly held that the absence of the signature of the principal or persons in whose behalf the undertaking is given in no wise affects its validity. (*Ney* v. *Orr,* 2 Mont. 559; *Pierse* v. *Miles,* 5 Mont. 549, 6 Pac. 347; *King* v. *Pony Gold Mining Co.,* 24 Mont. 470, 62 Pac. 783.)

The motion to dismiss was based upon a provision of the Act of March 7, 1899 (Laws 1899, p. 79), which, it is claimed, amended or repealed sections 1724 and 1725 in the particulars referred to, and so changed the rule that an appeal is not ef-

fectual unless it be supported by a bond executed by both principal and sureties, as therein directed. This Act is entitled: "An Act to amend sections 1053, 1057, 1059, 1067, 1073 and 1084 in Article IX, of Chapter VII, of Title I, of Part III, of the Political Code of the state of Montana, relating to Bonds of Officers and Other Bonds." Section 2 provides, among other things: "All official bonds must be signed and executed by the principal, and two or more sureties, or by the principal, and one or more surety companies organized as such under the laws of this state, or licensed to do business herein." Section 7 declares: "The provisions of this article, as the same shall be in force after amendment by this Act, shall apply to all official bonds and undertakings of receivers, executors, administrators and guardians, and to bonds and undertakings given in injunction proceedings, and to all bonds and undertakings required by law to be given and approved by any court, judge, board, person or body, and, except as to requirements of such approval, the provisions shall apply to all bonds given or required by law to be given in attachment proceedings, criminal actions or proceedings, bail bonds, appeal bonds, and all bonds given or required to be given in any legal proceedings or action in any court of this state."

The argument was that, since section 2 declares in specific terms that all official bonds shall be signed and executed by the principal and two or more sureties, or by the principal and one or more surety companies, and since section 7 makes the Article, as amended, applicable to all bonds or undertakings required to be given in judicial proceedings, including appeal bonds, the necessary result is that the Act is an additional piece of legislation, independent in form, displacing sections 1724 and 1725, *supra*, in so far as they provide for an undertaking, instead of a technical bond. Appellant's answer to this argument was that the title of the Act does not refer to any part of the Code of Civil Procedure, but only the provisions of Article IX, of Chapter VII, of Title I, of Part III of the Political Code; and, since the subject of bonds or undertakings on ap-

peal is not germane to the general subject expressed in the title, the provisions of section 7 are beyond the purview of the title, and, so far as they apply to these bonds or undertakings, are repugnant to section 23 of Article V of the state Constitution. This provision is that "no bill, except general appropriation bills, and bills for the codification and general revision of the laws, shall be passed containing more than one subject which shall be clearly expressed in its title; but if any subject shall be embraced in any Act which shall not be expressed in the title, such Act shall be void only as to so much thereof as shall not be so expressed."

To us appellant's reply seemed conclusive. The Article of the Political Code which the Act undertakes to amend deals exclusively with official bonds *eo nomine,* and bonds and undertakings of *quasi* officials or officers of the court, such as receivers, executors, administrators and the like. It nowhere has any reference or application to other bonds or undertakings which may be required in judicial proceedings. It will be observed that it relates to bonds of officers and other bonds. The title of the amendatory Act is descriptive of this condition, and by no rule of interpretation may the words "and other bonds" be held to be descriptive of any other character of bonds or undertakings than those described in the Article amended. No person reading the title, whether a member of the legislature or a private citizen, would be justified in concluding that the intention of the Act was to amend any other provision of law. Neither certainly would he gather from it the knowledge that the Act had slumbering in its bosom a provision which was designed to change an important feature of appellate procedure which had been a part of our statute law during the existence of the territorial and state governments. This knowledge could not be gained except by an examination of the whole amendatory Act, as well as the sections of the Code of Civil Procedure in question here.

The purpose of the provision of the Constitution has frequently been pointed out by this court. (*State* v. *Anaconda*

*Copper Min. Co.,* 23 Mont. 498, 59 Pac. 854; *State* v. *Brown,* 29 Mont. 179, 74 Pac. 366; *Yegen* v. *Board of County Commissioners,* 34 Mont. 79, 85 Pac. 740; *State* v. *Cunningham,* 35 Mont. 547, 90 Pac. 755.) It is "to restrict the legislature to the enactment of laws the objects of which legislators and the public as well may be advised of, to the end that any who are interested, whether as representatives or those represented, may be intelligently watchful of the course of the pending bill. The limitation is likewise designed to prevent legislators and the people from being misled by false or deceptive titles, and to guard against fraud in legislation by way of incorporating into a law provisions concerning which neither legislators nor the public have had any intimation through the title read or published." (*State* v. *Anaconda Copper Min. Co., supra.*)

The matter incorporated in section 7 is not referred to in the title, even upon the most liberal rule of construction; nor is it in any manner germane to the subject of legislation. So far, therefore, as it purports to deal with undertakings on appeal, the legislation is void.

At the time the motion to dismiss was submitted the court reached the conclusion stated above, and denied the motion, with the statement, however, that it would state its reasons for the decision when it decided the appeals on the merits. This fact was overlooked at the time the decision was rendered. Counsel have suggested the oversight, and also that a decision will set at rest a question upon which there is some controversy among the members of the bar. We have therefore deemed it not too late to submit these observations in a supplemental opinion giving briefly the reasons why the motion was not sustained.

The original undertaking having been prepared and filed in conformity with the provisions of sections 1724 and 1725, *supra,* it was, of course, sufficient to sustain the appeals.

Mr. Justice Holloway and Mr. Justice Smith concur.